IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **UNITED STATES OF AMERICA**, <br><br> Plaintiff, <br><br> v. <br><br> **JORGE ACEVEDO-MARTINEZ [7]**, <br><br> Defendant. | **CRIMINAL NO.**: 14-754 (DRD) |

**OPINION AND ORDER**

On December 18, 2014, a Federal Grand Jury returned an indictment against Jorge Acevedo-Martínez ("Codefendant" or "Acevedo-Martinez") and sixteen additional codefendants. On that same date, an arrest warrant was issued against him. At some point in time, Codefendant fled from Puerto Rico to avoid apprehension and prosecution. Notwithstanding, on February 4, 2018 Codefendant was arrested in the Dominican Republic by Dominican authorities. After said arrest, a search and seizure was performed in an apartment in the Dominican Republic under Codefendant's possession and control; as a result, various items were seized. On August 30, 2018, Codefendant filed a *Motion* alleging that all evidence, physical and testimonial, that resulted from the search should not be used in this proceeding. Initially, Codefendant's contention was that the search was performed as a joint venture between Dominican and Federal authorities **without a warrant** and absent exigent circumstances that would justify a warrantless search. Consequently, Codefendant reasoned that the Fourth Amendment's exclusionary rule should be applied. This matter was referred to a Magistrate Judge. *See* Dockets No. 1822 and 1823.

However, the Government then filed its *Opposition* to Codefendant's *Motion* and contested that the search and seizure was in fact supported by a *Search and Seizure Warrant* entered by a

Dominican Republic Court and that no joint venture was performed between Dominican and Federal authorities, since the Federal agents did not substantially participate during the procedure. *See* Docket No. 1839. Eventually, the Magistrate Judge entered a *Report and Recommendation* denying Codefendant's petition. *See* Docket No. 1961. In sum, the Honorable Magistrate Judge Camille L. Velez-Rive concluded that an evidentiary hearing was not necessary; recognized the validity of the Dominican *Search and Seizure Warrant*, that said *Warrant* was obtained as a result of the Dominican authorities' own investigations as to Codefendant's violation of Dominican law and determined that Codefendant had failed to show that the Federal agents participation in the events transpired in the Dominican Republic where "substantial" nor that the Dominican agents were acting as "agents" for the Federal Government.

Unsatisfied, Codefendant filed an *Objection* to the *Report and Recommendation*. Codefendant requested an evidentiary hearing since he believed the documentation provided by the Government was insufficient to support the conclusions of the Magistrate Judge. *See* Docket No. 1968. The Court granted Codefendant's request for an evidentiary hearing. *See* Docket No. 2004.[1] The evidentiary hearing was held February 26-27, 2020 and was strictly limited to discussing whether there was a joint venture between the Dominican and United States authorities that would warrant the application of the protections afforded by the Fourth Amendment of the United States Constitution to the search and seizure objected by Codefendant. To substantiate its arguments, the Government provided two witnesses: Felix Carrión ("Carrión"), Deputy United States Marshal, United States Marshal Service ("USMS") and Colonel Jesus Castillo Torres of the National Bureau of Drug Control of the Dominican Republic ("Col. Castillo"); Codefendant cross examined each witness.

---

[1] Consequently, the Court did not adopt the Magistrate Judges' decision as to the denial of an evidentiary hearing to discuss Codefendant's contentions.

2

After evaluating the witness testimonies provided during the evidentiary hearing, the Court makes the following determinations in relation to the findings of the Honorable Magistrate Judge.

## I.  Referrals to Magistrate Judges

The Court may refer dispositive motions to a United States Magistrate Judge for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). *See* Local Rule 159; Matthews v. Weber, 423 U.S. 261 (1976). Any party may contest the Magistrate Judge's report and recommendation by filing its objections. Fed. R. Crim. P. 59(b); 28 U.S.C. § 636(b)(1). A District Judge has various statutory conditions to follow when a Report and Recommendation has been challenged. "A judge of the court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). "A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate." *Id.* "Absent objection, . . . [a] district court ha[s] a right to assume that [the affected party] agree[s] to the magistrate's recommendation." Templeman v. Chris Craft Corp., 770 F.2d 245, 247 (1st Cir. 1985), *cert denied*, 474 U.S. 1021 (1985). Further, "failure to raise objections to the Report and Recommendation waives that party's right to review in the district court and those claims not preserved by such objections are precluded upon appeal." Davet v. Maccarone, 973 F.2d 22, 30-31 (1st Cir. 1992); *see* Henley Drilling Co. v. McGee, 36 F.3d 143, 150-51 (1st Cir. 1994) (holding that objections are required when challenging findings actually set out in a magistrate's recommendation, as well as the magistrate's failure to make additional findings); *see*, *also*, Lewry v. Town of Standish, 984 F.2d 25, 27 (1st Cir. 1993) (stating that "[o]bjection to a magistrate's report preserves only those objections that are specified"); Borden v. Sec. of H.H.S., 836 F.2d 4, 6 (1st Cir. 1987) (holding that appellant was entitled to a de novo review, "however he was not entitled to a de novo review of an argument never raised").

In order to accept unopposed portions of the Magistrate Judge's report and recommendation, the District Court need only satisfy itself that there is no "plain error" on the face of the record. See Douglass v. United Servs. Auto, Ass'n, 79 F.3d 1415, 1419 (5th Cir. 1996) (*en banc*) (extending the deferential "plain error" standard of review to the legal conclusions of a magistrate judge that were not objected to); *see*, *also*, Nettles v. Wainwright, 677 F.2d 404, 410 (5th Cir. 1982) (*en banc*) (appeal from district court's acceptance of a magistrate judge's findings that were not objected to was reviewed for "plain error"); *see*, *also*, Nogueras-Cartagena v. United States, 172 F.Supp. 2d 296, 305 (D.P.R. 2001) (finding that the "Court reviews [unopposed] Magistrate's Report and Recommendation to ascertain whether or not the Magistrate's recommendation was clearly erroneous") (adopting the Advisory Committee note regarding Fed. R. Civ. P. 72(b).

Thus, the Court shall conduct a *de novo* review of the objected portions of the report and recommendation while using the aforementioned "plain error" standard for the portions that have not been objected.

## II. Relevant Factual Findings[2]

The Special Investigations Bureau ("SIB") of the of the National Bureau of Drug Control of the Dominican Republic ("NBDC") oversees the capture of United States fugitives in the Dominican Republic. See Transcript for February 27, 2020 Hearing, Docket No. 2143 at 4 (hereinafter, "Docket No. 2143"). Over a year prior to Codefendant's arrest, the United States provided the SIB with the federal indictment and arrest warrant issued against Acevedo-Martínez. See Docket No. 2143 at 37; Transcript for February 26, 2020 Hearing, Docket No. 2140 at 61-63

---

[2] The Court notes that the testimonies provided during the hearing corroborate and provide context to the Reports of Investigation referenced by the Magistrate Judge in the *Report & Recommendation*. See Docket No. 1844-1 and 2.

(hereinafter, "Docket No. 2140").³ Afterwards, the SIB proceeded to gather information as to Codefendant through their independent surveillance and informants. *See* Docket No. 2143 at 38; 67; 106-107. Through their efforts, the SIB managed to uncover Codefendant's residency (Tower Gil Roma 31, Apartment 13B), places he was known to frequent and the vehicles he was using to transport himself. *See* Docket No. 2143 at 5, 13-14. Also, prior to his arrest, the SIB made a petition to the head of the NBDC to request a search and seizure warrant; after the approval of the request was granted, Germán Villalona, Dominican Prosecutor, presented the formal Petition to a Dominican Court and obtained the *Search and Seizure Warrant* on February 3, 2018. *See* Docket No. 2143 at 24. ⁴

On the day the *Search and Seizure Warrant* was issued, February 3, 2018, USMS Carrión was informed by Pete Acosta ("Acosta"), USMS liaison in the Dominican Republic, that Codefendant was located in the Dominican Republic. *See* Docket No. 2140 at 36. On said date, Carrión traveled to the Dominican Republic with Miguel Colón-Escalante, USMS Task Force Officer. Id. Their sole mission was to bring Codefendant back to the United States should the Dominican authorities managed to apprehend him, as the USMS has no authority to perform arrests in the Dominican Republic. Id. 95.

Upon arrival, Carrión and Colón-Escalante were driven by a NBDC agent to the building where Codefendant's apartment was located. Id. at 37-38. There, from the vehicle, Carrión, Colón-Escalante and the NBDC agent conducted surveillance. However, unbeknown to Carrión, Colón-Escalante and the NBDC agent, Codefendant had left his apartment. Notwithstanding, he was

---

³ The testimony of both witnesses reveals that Acosta, Carrión and the SIB were in continuous communications between them as to the arrest of the Codefendant. *See* Docket No. 2140 at 88.
⁴ The testimony of Carrión reveals that he was not involved in the application for the Dominican search warrant and he had no knowledge of an independent Dominican investigation as to Codefendant. *See* Docket No. 2140 at 51; 85-86.

tracked, pursued, engaged and -after a gunfight- arrested by **other** NBDC agents at a separate location. *See* Docket No. 2143 at 5; 13. Carrión, Colón-Escalante and the NBDC agent where then informed of the capture of Codefendant and proceeded to wait for the NBDC agents who had made the arrest to arrive with Codefendant at the apartment building.[5] *See* Docket No. 2140 at 40-41.[6]

On February 4, 2018, at approximately 2 a.m., the NBDC agents who captured Codefendant arrived with him at the apartment building where he was residing. Id. at 42. Carrión and Colón-Escalante went up to the apartment and met with Acosta who had made his way to the apartment with Col. Castillo.[7] Id. at 43; Docket No. 2143 at 23-25. There, the Federal Agents were informed by the Dominican Prosecutor that a Dominican Court had entered a *Search and Seizure Warrant* that justified the NBDC's intervention. Id. at 49-50. Although present in the apartment until the end of the procedure, the three Federal Agents limited their participation to observing the search and seizure being performed by the NBDC agents. Id. at 46; Docket No. 2143 at 29.[8] It was Col. Castillo, Colonel Batista and the Dominican Prosecutor who lead the protective sweep and search of the apartment. Id. at 53; Docket No. 2143 at 26-29.

After the search and seizure was concluded, the NBDC agents transported Codefendant to the NBDC jail. *See* Docket No. 2143 at 30. The Federal Agents accompanied the Dominican agents to escort Codefendant to the prison; however, they had no participation in the processing of Codefendant in the NBDC prison. *See* Docket No. 2140 at 52-53; 92. The next day, February 5,

---

[5] Neither Carrión, Colón-Estaclante nor Acosta participated in the gunfight nor the resulting arrest of Codefendant. *See* Docket No. 2143 at 21-22.
[6] Neither Carrión, Colón-Escalante nor Acosta were present during the arrest of Codefendant. *See* Docket No. 2140 at 96.
[7] Both testimonies of the two witnesses affirm that none of the federal agents provided any instructions during the search and seizure to the Dominican authorities. *See* Docket No. 2140 at 73; Docket No. 2143 at 29.
[8] Codefendant's Counsel inquired as to the reasons the federal agents were even allowed to be present during the search and seizure. The testimonies reveal that the NBDC authorized their presence as they were the party of interest in the **apprehension** of Codefendant. *See* Docket No. 2140 at 81; 89-90; Docket No. 2143 at 89 ("Yes, because he is a party of interest, because the ones who were looking for him was the United States, the U.S. Marshals Service. That's why he was present there.")

2018, Codefendant was escorted by the NBDC agents the Air Force Base at San Isidro. *See* Docket No. 2143 at 31. Codefendant was then extradited to Puerto Rico by Carrión and Colón-Escalante. *See* Docket No. 2140 at 52. As to the items seized, Carrión and Colón-Escalante returned to the United States with part of the evidence seized by the NBDC agents during the search and seizure; nonetheless, the Dominican Prosecutor decided which items of evidence were provided to the USMS. *See* Docket No. 2143 at 100-101.

### III.     Legal Standard

The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. To that end, the purpose of the Amendment "'is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials.'" Carpenter v. United States, 138 S. Ct. 2206, 2213, 201 L. Ed. 2d 507 (2018); *see*, *also*, Camara v. Municipal Court of City and County of San Francisco, 387 U.S. 523, 528 (1967). In order to fulfill said purpose, an "exclusionary rule", which generally establishes that the government is prevented from using most evidence gathered in violation of the Fourth Amendment, is enforced by the Courts. *See*, *e.g.*, Mapp v. Ohio, 367 U.S. 643 (1961).

However, "[o]rdinarily, the Fourth Amendment's exclusionary rule does not apply to foreign searches and seizures, for the actions of an American court are unlikely to influence the conduct of foreign police." United States v. Hensel, 699 F.2d 18, 25 (1st Cir.1983)." *See*, *also*, United States v. Janis, 428 U.S. 433, 455 (1976) ("It is well established, of course, that the exclusionary rule, as a deterrent sanction, is not applicable where a private party or a foreign government commits the offending act."); United States v. Valdivia, 680 F.3d 33, 51 (1st Cir.

7

2012); United States v. Mitro, 880 F.2d 1480, 1482 (1st Cir. 1989). "The reasoning behind this rule is that the exclusion of evidence by an American court has little to no deterrent effect on foreign police practices." United States v. Frank, 599 F.3d 1221, 1228 (11th Cir. 2010); *see*, *also*, *United States v. Morrow,* 537 F.2d 120, 139 (5th Cir. 1976). Consequently, evidence obtained during searches by foreign authorities is generally admissible in federal court, regardless of their compliance with Fourth Amendment standards. *See* United States v. Rosenthal, 793 F.2d 1214, 1230 (11th Cir. 1986); United States v. Morrow, 537 F.2d 120, 139 (5th Cir. 1976).

Notwithstanding, the aforementioned principle has two exceptions: "(1) where the conduct of foreign police shocks the judicial conscience, or (2) where American agents participated in the foreign search, or the foreign officers acted as agents for their American counterparts. *United States v. Mitro,* 880 F.2d 1480, 1482 (1st Cir.1989)." United States v. Valdivia, 680 F.3d 33, 51 (1st Cir. 2012); United States v. Alexander, 817 F.3d 1178, 1182 (9th Cir. 2016); United States v. Barona, 56 F.3d 1087, 1091 (9th Cir. 1995). Codefendant has not alleged that first exception is present and the Court believe it's not applicable here. Consequently, the Court will focus its analysis on the second exception, commonly known as the "joint venture doctrine".

The second exception is usually satisfied if the Court finds that the American agents' participation in the search was so substantial it converts the search into a joint venture. *See*, *for example*, Stonehill v. United States, 405 F.2d 738, 743 (9th Cir.1968). Now, there is no binding legal precedent or rule as to particular facts or factors which must be considered by the Court when reaching the final analysis. Therefore, whether American agents participated in a foreign search or foreign officers acted as agents of their American counterparts constitutes a a "factually based issue" that involves "applying a legal label to a complex set of facts." United States v. Hensel, 699 F.2d at 25.

### IV. Discussion

After the evidentiary hearing, both parties filed memorandums in support of their contentions. *See* Dockets No. 2144 and 2146. Codefendant contends that the Government failed to carry the burden of proving that there was no joint venture in this case. *See* Docket No. 2146 at 4. To that end, Codefendant proffers that (a) the federal agents in the Dominican Republic had an active participation during the search and (b) that the Dominican officers acted as agents of the Federal authorities when they obtained and executed the search warrant. Id. at 3. On the other hand, the Government essentially argued that the witness testimonies during the evidentiary hearing support their theory that there was no joint venture because: (a) the Federal agents were not involved in the application of the Dominican search warrant; (b) the Federal Agents were not involved in the execution of the search warrant. *See* Docket No. 2144 at 5-6.

In order to structure his analysis of the facts provided by the witnesses during the evidentiary hearing, Codefendant relies heavily on the First Circuit's application of the joint venture doctrine in *United States v. Hensel*, *supra*. Codefendant argues that *Hensel* is on point; however, the Court disagrees.

First, the Court notes that the factual scenario in *Hansel* is diametrically different from the matter at hand. In *Hansel* a Canadian ship stopped a Honduran boat off the coast of Nova Scotia; in said boat a crew of eight Colombian was apprehended hauling 18.7 tons of marijuana. The Canadian vessel intervened with the Honduran boat at the request of the United States Coast Guard after the United States had initiated the pursuit of the Honduran ship. None of these facts relate in any way to the case at hand; however, Codefendant suggests that the following analysis made by the District Court, which the First Circuit affirmed, is similar to the one this Court should apply here:

> The surveillance which led to the stop of the [] [vessel] was initiated by the United States Coast Guard. It was at the request of the Americans that the Canadians became involved in the pursuit. DEA Agent Drinan urged the Canadians to board if the vessel entered Canadian waters. When it became apparent that the [] [Americans] could not board the [] [vessel] until the consent of the Honduran government was obtained, the [] [Americans] agreed to support a boarding by the [] [Canadians] by displaying its fire power and providing backup assistance if required. The [] [Americans] dispatched two interpreters to the [] [vessel] to help the Canadians question the Spanish speaking crew. Lt. Schenk [an American law enforcement officer] also went aboard the [] [vessel]. He accompanied Canadian officers in a second search of the vessel; examined documents, electronics equipment and charts; and obtained the identities of the crew for submission to DEA Agent Drinan in Maine.
>
> [….]
>
> The record discloses that the United States Coast Guard instigated, coordinated and closely collaborated with the Canadians in effectuating the seizure and search of the [] [vessel in Canadian waters]. In short, the participation of the Americans was sufficiently substantial to permit defendant to invoke the protection of the Fourth Amendment.

*United States v. Hensel*, 509 F.Supp. 1364, 1372-1373 (U.S.D.C. Maine 1981). In light of said analysis, Codefendant invites the Court to consider the following factual conclusions: it was the Federal Government who initiated the pursuit of Codefendant in the Dominican Republic and required Dominican authorities assistance in his apprehension; the Federal agents did surveillance while on the Dominican Republic; the Federal agents participated in the search of the apartment by providing support and assistance with their presence and law enforcement status and knowledge; the Federal agents escorted Codefendant from the place of his arrest to his apartment; the Federal agents escorted Codefendant from his apartment to prison; the Federal agents escorted Codefendants from prison to the airport; the Americans kept custody of some of the evidence seized; the Dominican authorities had no intention to prosecute Mr. Acevedo for any violation to Dominican laws; Codefendant was expelled from the Dominican Republic and no criminal charges have been filed against him there; Dominican authorities had a deportation order before

10

Codefendant's arrest; the Dominican agents that participated in the arrest and search belong to a US Marshal Federal Fugitive Task Force exclusively dedicated to assist USMS in federal fugitive cases; and the Dominican *Search and Seizure Warrant* was based exclusively on the facts of the federal case. *See* Docket No. 2146 at 7.

Therefore, the Court must analyze whether Codefendant's factual propositions are supported by the evidence presented before the Court during the evidentiary hearing and what weight, if any, should said propositions be afforded in the context of the federal joint venture doctrine analysis.

1. ***The Federal Government initiated the pursuit of Codefendant in the Dominican Republic***.

It is an uncontested fact that this case was initiated by the federal indictment and arrest warrant issued in Puerto Rico against Codefendant on December 18, 2014. It is also an uncontested fact that the information pertaining to said indictment and warrant were provided to the NBDC by Federal authorities. Moreover, the testimonies provided during the evidentiary hearing evinced that additional information was shared between the Federal and Dominican government prior to his arrest. However, contrary to Codefendant's contention, the sharing of information is insufficient to determine that the joint venture doctrine applies to this case.

Codefendant reasons that the Federal Government lacks authority to request and/or execute arrests and search and seizure warrants, *sua sponte*, in a foreign country. Docket No. 2146 ¶ 3. He is correct; and this is critical since Codefendant cannot ignore the reality of the context in which his arrest, and corresponding search and seizure, were actually made.

In order to capture federal fugitives in a foreign nation, cooperation between the Federal Government and a foreign government is required. Therefore, it is only logical that said cooperation involves sufficient active communication between the sovereigns to share relevant

information and coordinate the necessary actions to achieve a fugitive's capture. In recognizing said reality, Circuit Courts and District Courts have determined that said cooperation, in itself, is not sufficient to warrant the application of the joint venture doctrine. *See*, *for example*, United States v. Beherty, 32 F.3d 503, 511 (11th Cir. 1994); United States v. Maturo, 982 F.2d 57, 61 (2nd Cir. 1992). If this interaction was sufficient to activate a joint venture, the doctrine would have no purpose, as every single request for aid in the capture of a fugitive made by the United States to any foreign nation would automatically activate the Fourth Amendment protections to searches and seizures performed there.

2. ***The Federal Government actively participated in the search by providing surveillance, presence, law enforcement status and knowledge***.

As Codefendant correctly points out, the testimonies provided during the evidentiary hearing evince that Carrión and Colón-Escalante did surveil the building where Codefendant's apartment was located, a few hours before his arrest. However, the Court finds that Codefendant is overstating the importance of this fact.

Carrión and Colón-Castillo's participation in the surveillance was not a substantial action in furtherance of a joint venture. Carrión's testimony, at times, bolsters the importance of his participation during the referenced surveillance. Although this Court does not question the federal agents' capacities and the expertise he might possess in performing surveillance, the facts that can be properly derived from both testimonies delivered before the Court indicate that the Federal agents' involvement in the surveillance was of no significance to the actual capture of Codefendant and the eventual search that took place in his apartment.

To that end, first, the Court highlights that the identification of Codefendant's apartment was a result of the Dominican authorities' own investigations prior to February 2018. *See* Docket No. 2413 at 106 lines 18-21. Thus, the surveillance performed by the Federal agents on February

3, 2018 did not provide any new information in furtherance of Codefendant's capture nor the eventual search. Second, Carrión's testimony evinces that the Federal agents were not even aware that Codefendant had left the building after their arrival; certainly, this fact makes it highly improbable that they managed to provide any significant support to the effort being made by the NBDC to capture Codefendant. *See* Docket No. 2140 at 40 lines 22-24. Consequently, the surveillance performed by the federal agents on February 3, 2018, did not constitute a significant action that should be weighted in support of Codefendant's joint venture theory.

As to the search of Codefendant's apartment, the Court recognizes that the testimonies do not provide clarity as to the location of the federal agents, within the apartment, at any given point in time during the search. However, the testimonies desmonstrate, to the Court's satisfaction, that not one of the three Federal agents had commanding authority over the searched performed by the Dominican authorities nor intervened in any way that would allow the Court to determined they had an active substantial participation as to the search. *See Docket No. 2140 at 73; Docket No. 2143 at 29*.

Consequently, as stated in the outlined facts, the Court believes that it is an undisputed fact that the Federal agents were present during the surveillance performed outside of Codefendant's apartment building and the eventual search performed in the apartment. However, they were mere observes as to the search. *See* Docket No. 2143 at 28. Their participation was limited to such degree that these facts do not demonstrate a substantial participation that supports Codefendant's joint venture argument. *See*, *for example*, United States v. LaChapelle, 869 F.2d 488, 490 (9th Cir. 1989) (holding that United States' lack of authority controlling a wiretap operation was sufficient to defeat a joint venture argument).

13

### 3. *The Federal agents escorted Codefendant.*

Codefendant attempts to further his joint venture theory by highlighting the Federal agent's participation in escorting Codefendant at three junctures: (a) from the arrest site to the apartment; (b) from the apartment to the prison; and (c) from the prison to the airport. However, the Court finds that Codefendant's reading of the testimonies as to this matter is almost entirely misplaced.

After Codefendant was arrested by the NBDC agents, Col. Castillo arrived with Acosta, in the same vehicle, at the scene. Codefendant suggest that, after the arrest, Acosta drove Codefendant to the apartment. However, the Court finds that there was no testimony that supports their proposed fact. Instead, the Court notes that Col. Castillo's testimony indicates that there were multiple other people that may have possibly escorted Codefendant to the apartment. To that end, Col. Castillo's testified that: "Pete Acosta was there, Lieutenant Colonel Batista, Major Sargent Doñe and Myself". Docket No. 2143 at 22. Moreover, Codefendant also failed to highlight that after Col. Castillo ordered that codefendant be put in the SUV, he "also put in two more agents –or two agents of the [NBDC] to keep custody of him." Id. at 23. Consequently, there is no evidence to support Codefendant's contention that it was Acosta -and not the various other individuals present- who escorted him to the apartment building.

As to Codefendant's transportation form the apartment to the NBDC prison, the testimonies support the fact that the federal agents joined the NBDC escort. However, the testimonies do not evince that the Federal agents had any authority or control over the escort. *See*, *for example*, Docket No. 2140 at 51 (in response to the Government's question as to who drove Codefendant to prison, Carrión responded as follows: "[t]he Dominican nationals, sir."). Moreover, the Court show that both testimonies evince that the Federal agents had no participation in the processing of Codefendant when he arrived at the NBDC prison. *See* Docket No. 2140 at 51, 90-92; Docket No.

14

2143 at 98. Hence, the Federal agents' participation in the escort of Codefendant from his apartment to the prison does not support the joint venture theory.

Finally, Codefendant argues that Federal agents had an active role in the transport of Codefendant form the NBDC jail to the airport; the testimonies do not support said contention. In response to the Defense attorney's questions as to this matter, Carrión testified that he did not recall if Acosta drove Codefendant to the airport. *See* Docket No. 2140 at 51. Furthermore, Col. Castillo unequivocally testified that it was the "Rapid Response Unit" of the NBDC that transported Codefendant to the airport. *See* Docket No. 2143 at 31.[9] Once again, Codefendant's proposed fact is unsupported by the evidence presented before the Court and cannot support his theory.

### 4. *The Federal agents received part of the items seized in Codefendant's apartment.*

Undoubtedly, the Federal agents received part of the evidence seized in Codefendant's apartment; that is the reason why the Court is at this juncture. Codefendant contends that this fact points to a joint venture. However, the Court finds that the concession of certain pieces of evidence to the Federal agents by the Dominican authorities is one of the strongest facts against Codefendant's theory.

As previously highlighted, Carrión and Colón-Escalante -through Pete Acosta- received certain items of the evidences seized in Codefendant's apartment when they were heading back to Puerto Rico on February 5, 2018. *See* Docket No. 2140 at (In response to Defense attorney's question as to the evidence the Federal agents received, Carrión stated that: "[o]nly evidence that was provided by the [NBDC] – the [NBDC] provided it to Pete Acosta, and then Pete Acosta

---

[9] To questions as to the transportation of Codefendant Col. Castillo informed that "[Acosta] went, but in his vehicle, and Mr. Avecedo[-Martinez] was transported in the Tactical Reaction vehicle of the DNCD. Two vehicles." Docket No. 2143 at 99.

provides it to us […]"). Furthermore, the Court now notes that is essential to highlight that the evidence provided to Acosta was the items that the Dominican authorities chose to provide them. As to this matter, Col. Castillo's testimony revealed that the Dominican Prosecutor decided which items of evidence were provided to the USMS. *See* Docket No. 2143 at 100-101. The Court finds that the last fact further supports the fact that the Federal agents had no control over the search and seizure nor its results.

5. ***The Dominican government had no intention of prosecuting Codefendants and, to this date, no criminal case has been filed in the Dominican Republic against him.***

Codefendant suggests that a joint venture between the Federal and Dominican governments was in place because the Dominican authorities had no intention in prosecuting Codefendant under Dominican law. To support his contention, Codefendant points to the fact that the NBDC had an order to extradite Codefendant before his arrest even took place. Although the fact that the Dominican authorities had an extradition order can be derived from the testimony, no evidence was provided by the witnesses nor Codefendant to determine the Dominican's government "intention" to prosecute Codefendant. The Court will not provide credit to this argument as it the same constitutes merely a theory. Furthermore, no definitive evidence was provided to the Court for it to determine if, to this date, no criminal charges have been filed against Codefendant in the Dominican Republic. The Court is not in a position to afford any weight to this argument.

6. ***Dominican agents "belonged" to the USMS Task Force.***

Codefendant suggests that the agents that worked for the unit under the command Col. Castillo, basically "belonged" to the USMS. The testimonies provided by both witnesses support the fact that the SIB is dedicated to assist the USMS in the capture of United States fugitives in the Dominican Republic. However, the testimonies do not support that the SIB is, in fact, part of or controlled by the USMS. Codefendant also failed to provide any additional evidence to support

his theory. Therefore, Codefendant's theory is unsupported by the evidence provided during the hearing and must be discarded.

7. ***The Dominican Search and Seizure Warrant was essentially based on the information provided by the Federal agents.***

Codefendant's contention as to this matter is problematic at this juncture. As Codefendant documented in his *Memorandum*, he has continuously objected to the authenticity of the *Search and Seizure Warrant* issued by the Dominican Court. *See* Docket No. 2146 at 15-18. The Court notes that, prior to holding the evidentiary hearing, it entered an *Order* requiring the Government to provide a copy of said *Warrant* in compliance with the applicable Federal Rules of Evidence; however, the Government failed to provide it to the Court during the hearing. *See* Docket No. 2131. Despite the Government's incompliance, and the latency of the issue, Codefendant chose not to request the Court to resolve this matter during the hearing nor prior to resolving the joint venture issue. Consequently, the Court cannot adopt the Magistrate Judge's Report and Recommendation as to the validity of the *Warrant* at this time; furthermore, it will not consider the contents of the *Warrant* -nor the documents related to its request- in support of the arguments raised by either the Government or Codefendant.

Nonetheless, the Court does recognize that the testimonies provided during the evidentiary hearing support the Government's contention that the decision -and later application and entry- of the *Search and Seizure Warrant* was an independent decision of the NBDC. Consequently, Federal agents were not involved -in any way- with the request and/or issuance of the *Search and Seizure Warrant* entered by the Dominican Court.

Finally, as stated in the facts, albeit the Court will not consider the documents that were used to request the referenced *Warrant*, Col. Castillo's testimony demonstrates that the information in the possession of the NBDC related to Codefendant, his whereabouts, residence,

vehicles and activities was not exclusively provided by the Federal Agents but was obtained, in large part, by independent efforts made by the NBDC. Both of these facts definitively support the Government's position.

### V. Conslusion

After analyzing the factual conclusions proposed by Codefendant in support of his joint venture theory, the Court finds that this case is even further away and not near to *Hensel*. Codefendant cited a section of the opinion where the First Circuit's expressed that in that case there were facts that suggested "significant American involvement while other suggested the contrary". United States v. Hensel, *supra*, 699 F.2d 25. However, contrary to *Hensel*, this case is not a "close call" to said case; the factual conclusions that Codefendant proposed in support of his theory are neither supported by the evidence provided to the Court during the evidentiary hearing nor sufficient to justify the application of the joint venture doctrine.

The relevant factual findings demonstrate that there was, in fact, cooperation between the Federal Government and the Dominican authorities in order to capture Codefendant in the Dominican Republic; however, the sharing of information between the sovereigns and the limited participation of the Federal agents during the arrest, search and escort of Codefendant in the Dominican Republic do not support a "significant American involvement" that would warrant the application of the joint venture doctrine. Furthermore, the evidence also showed that the Dominican authorities made independent decisions as to how and "the when" of the arrest, the search and escorts where to be performed and even decided that some seized items where to be furnished to the Federal agents. Consequently, although working to assist the Federal Government, the Dominican authorities' independence as to the decision making in all aspects of this operation cannot turn them into mere "agents" of the Federal Government in order to activate the joint venture doctrine.

Pursuant to the above, the Court **adopts in part**, the Honorable Magistrate Judge's *Report and Recommendation* and affirms the decision as to the none existence of the joint venture; therefore, Codefendant's *Motion to Suppress* is **<u>DENIED</u>**.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, May 18, 2020.

*S/Daniel R. Domínguez*
Daniel R. Domínguez
United States District Judge